## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| SHERRY L. MENDOZA, | ) | Case No. 5:22-cv-02281 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | James E. Grimes Jr. |
| J.M. SMUCKER COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## **OPINION AND ORDER**

Like many employers, The J.M. Smucker Company required its workforce to get vaccinated against COVID-19. Under its policy, and to comply with the law, Smucker afforded employees medical or religious exemptions. Plaintiff Sherry L. Mendoza requested an exemption based on her religious beliefs. Specifically, Ms. Mendoza objected that she could not receive the available vaccines consistent with her Christian faith because they were developed from fetal cell lines of aborted fetuses. Put to the choice, as she saw it, "between her God and her job" (ECF No. 1, ¶ 37, PageID #7), Ms. Mendoza adhered to her faith, lost her job, and initiated this lawsuit.

Plaintiff claims that her termination from Smucker violates federal, Ohio, and Louisiana laws against employment discrimination based on religion. In addition, she maintains that Smucker violated her rights under the Americans with Disabilities Act. Defendant moves for partial dismissal. Specifically, it seeks to dismiss Plaintiff's claims based on Ohio law, because Ms. Mendoza worked for the

company in Louisiana, and her claim based on wrongful disclosure of medical information under the Americans with Disabilities Act. For reasons that follow, the Court **GRANTS** Defendant's partial motion to dismiss.

## STATEMENT OF RELEVANT FACTS

Taking the facts alleged in the complaint as true and construing them in Plaintiff's favor, as the Court must on the motion before it, Plaintiff bases her claims on the following relevant facts.

### A.   Smucker's COVID-19 Policy

Defendant The J.M. Smucker Company is an international seller of food products with its principal place of business in Orville, Ohio. (ECF No. 1, ¶ 3, PageID #2.) "Four in five American pantries contain Smucker's products." *Ciraci v. J.M. Smucker Co.*, 62 F.4th 278, 280 (6th Cir. 2023).

At the onset of COVID-19, Smucker implemented measures to protect its workforce from the virus and to maintain operations during the lockdowns. Smucker required social distancing in its offices and allowed employees to work either remotely or in person. (ECF No. 1., ¶ 20, PageID #3.) As a salaried employee, Ms. Mendoza used both options but spent most of her time working at her office. (*Id.*) In July 2021, Smucker relaxed its in-office social distancing requirements for employees who showed proof of vaccination. (*Id.*, ¶ 21, PageID #4.) Smucker required its remaining employees, those who were unvaccinated or opted not to disclose their vaccination status to human resources, to work in a "specified area in the office designed for non-vaccinated staff members." (*Id.*) Ms. Mendoza was one such employee. (*Id.*, ¶ 24.)

In October 2021, Smucker notified its workers that getting "vaccinated against COVID-19" will be "a condition of their continued employment." (*Id.*, ¶ 26, PageID #5.) Under this policy, employees could request accommodation for legally protected medical or religious purposes. (*Id.*; *see also id.*, ¶ 47, PageID #8.) Employees who failed to comply with the policy were subject to termination as of December 16, 2021 and ineligible for severance. (*Id.*, ¶ 27, PageID #5.) That timing roughly coincides with the Emergency Temporary Standard (popularly known as the vaccine mandate) promulgated by the Occupational Safety and Health Administration, 86 Fed. Reg. 61402; 29 C.F.R. § 1910.501(m)(2)(ii), which the Supreme Court ultimately stayed before it took effect, *see National Fed'n of Indep. Bus. v. Department of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 662 (2022) (per curiam).

## B.    Ms. Mendoza's Requested Religious Exemption and Termination

Plaintiff Sherry L. Mendoza worked at Smucker for more than 10 years in New Orleans, Louisiana. (ECF No. 1, ¶¶ 17 & 18, PageID #3.) Most recently, Ms. Mendoza held the role of senior manager in process engineering. (*Id.*, ¶ 18.) As a member of The New Orleans Church, Ms. Mendoza identifies as a devout Christian. (*Id.*, ¶ 14.) Her faith prohibits her from "receiving a COVID-19 vaccine derived from aborted fetal stem cell lines." (*Id.*, ¶ 15.) When Smucker designated an office space for workers who failed to prove their vaccination, Ms. Mendoza "relocate[d] her desk" to that "area of the office." (*Id.*, ¶ 24, PageID #4.) Ms. Mendoza alleges that relocating her desk revealed to her colleagues her vaccination status, private health information that Smucker had an obligation to keep confidential. (*Id.*) Nonetheless, Ms. Mendoza "abided by all social distancing requirements and mandates." (*Id.*, ¶ 20, PageID #3.)

3

Two days after Smucker announced a vaccine requirement, Ms. Mendoza sought a religious exemption.  (*Id.*, ¶ 28, PageID #5.)  She submitted a written request explaining that compliance with the vaccine requirement "conflicts with my God-given conscience and my unwavering religious beliefs."  (ECF No. 1-3, PageID #20.)  Over a month later, human resources personnel held a conference call with Ms. Mendoza regarding her request.  (ECF No. 1, ¶ 31, PageID #6.)  They posed a series of questions, asking Ms. Mendoza to identify her "religion or religious belief"; explain how her "faith impacts her everyday li[f]e" and how long she "had adhered to her religious belief"; and disclose whether she had "received any prior vaccines" or "a flu shot," Ms. Mendoza's children had been vaccinated, she "avoided other medications or medicines based on her belief," or had "ever requested a religious exemption before."  (*Id.*, ¶ 33.)  Ms. Mendoza objected and resisted "disclosing her confidential medical history during the interview."  (*Id.*, ¶ 84, PageID #13.)

Smucker presented "the same questions . . . to everyone else submitting religious accommodation requests."  (*Id.*, ¶ 32, PageID #6.)  Despite granting religious exemptions to "similarly situated" employees, Smucker denied Ms. Mendoza's request.  (*Id.*, ¶¶ 37, 38 & 47, PageID #7 & #8.)  Ms. Mendoza suggests that part of the reason for this denial was her "object[ion] to" answering some of the questions. (*Id.*, ¶ 84, PageID #13.)  Ms. Mendoza asked Smucker to reconsider, supplementing her request with additional information: a letter from the leader of her church, links to sources of further information, and proposed accommodations commensurate to

4

her religious needs "that would not impose any undue hardship on the company." (*Id.*, ¶ 39, PageID #7.)

Smucker did not respond.  (*Id.*, ¶¶ 40 & 41, PageID #7–8.)  By mid-December 2021, Ms. Mendoza's manager conducted an exit discussion and instructed her to return her work computer, badge, and company credit card.  (*Id.*, ¶ 43.)  On December 15, 2023, Smucker terminated Ms. Mendoza's employment, though she was told that she could return to work if vaccinated within 30 days.  (*Id.*, ¶ 44, PageID #8.)  The next day, Ms. Mendoza reported to work and received a formal termination letter. (*Id.*, ¶ 45; ECF No. 1-4, PageID #21.)

### C.    EEOC Charge

Ms. Mendoza timely filed a charge of wrongful termination with the Equal Employment Opportunity Commission.  (ECF No. 1, ¶ 10, PageID #2.)  The EEOC dismissed the charge and issued a right-to-sue letter.  (*Id.*, ¶ 11, PageID #2; ECF No. 1-2, PageID #18.)  This suit followed.

## STATEMENT OF THE CASE

In her complaint, Plaintiff alleges that her termination constitutes religious discrimination because Smucker failed to accommodate her religious beliefs and retaliated against her for seeking an exemption.  (ECF No. 1, ¶¶ 63, 66 & 75, PageID #10–12.)  Also, she claims that Smucker wrongfully inquired into and disclosed her medical information.  (*Id.*, ¶ 82, PageID #13.)  Based on these allegations, Plaintiff asserts claims in Counts One and Two under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq.*), Ohio law (Ohio Rev. Code § 4112.01, *et seq.*), and Louisiana

law (La. Stat. Ann. § 23:301, *et seq*.).  She also brings a claim in Count Three under the Americans with Disabilities Act (42 U.S.C. § 12112(d)).

Pursuant to Rule 12(b)(6), Defendant moves to dismiss Plaintiff's claims under the Americans with Disabilities Act and Ohio law.  (ECF No. 10.)  Plaintiff opposes the motion.  (ECF No. 13.)  At the Court's direction, the parties filed supplemental briefs addressing the State-law claims.  (ECF No. 16; ECF No. 21; ECF No. 22.)

## ANALYSIS

At the motion to dismiss stage, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint "states a claim for relief that is plausible, when measured against the elements" of the cause of action asserted.  *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. American Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)).  To meet Rule 8's pleading standard, a complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  To state a claim, a complaint must "raise a right to relief above the speculative level" into the "realm of plausible liability."  *Twombly*, 550 U.S. at 555.

In assessing plausibility, the Court construes factual allegations in the complaint in the light most favorable to the plaintiff, accepts the factual allegations of the complaint as true, and draws all reasonable inferences in the plaintiff's favor.

*Wilburn v. United States*, 616 F. App'x 848, 852 (6th Cir. 2015).  In reviewing a motion to dismiss, the Court distinguishes between "well-pled factual allegations," which it must treat as true, and "naked assertions," which it need not treat as true.  *Iqbal*, 556 U.S. at 628.  The Court will also not accept as true "[c]onclusory allegations or legal conclusions masquerading as factual allegations[.]"  *Eidson v. Tennessee Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

On a motion under Rule 12(b)(6), the Court's inquiry is limited to the content of the complaint, although it may also consider matters of public record, orders, items appearing in the record of the case, and exhibits attached to or made part of the complaint.  *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001).  In this case, Plaintiff's opposition to the motion to dismiss introduces a new exhibit:  a written copy of Smucker's "Policy on Mandatory COVID-19 Vaccinations" dated October 11, 2021.  (ECF No. 13-1, PageID #105–06.)  Because Smucker's policy is "referred to in the complaint and [is] central to the claims contained therein," the Court may consider it on a motion to dismiss although not formally a part of the pleadings without converting the motion to one for summary judgment.  *DeShetler v. FCA US LLC*, No. 3:18 CV 78, 2018 WL 6257377, at *4 (N.D. Ohio Nov. 30, 2018) (quoting *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016)).  In any event, the information in that document duplicates the allegations about the policy in the complaint.  (*Compare id.*, *with* ECF No. 1, ¶¶ 26–27, PageID #5.)  Further, the parties do not reference or make arguments about the policy beyond the specific allegations appearing on the

face of the complaint.  Therefore, the Court proceeds without converting the motion to dismiss to one for summary judgment.

## I.  ADA

The Americans with Disabilities Act prohibits employment discrimination "on the basis of disability."  42 U.S.C. § 12112(a).  Under the ADA, a "disability" means "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  Having a "record of such an impairment" or "being regarded as having such an impairment" also qualifies.  *Id.* § 12102(1)(B) & (C).  The Act's "prohibition against [disability] discrimination . . . include[s] medical examinations and inquiries."  *Id.* § 12112(d)(1).  The ADA confers medical-inquiry protections on three classes of individuals: (1) pre-offer applicants, *id.* § 12112(d)(2), (2) post-offer applicants, *id.* § 12112(d)(3), and (3) employees, *id.* § 12112(d)(4).  For employees such as Ms. Mendoza, inquiries "as to whether [she] is an individual with a disability" must be "job-related and consistent with business necessity."  *Id.* § 12112(d)(4)(A).  Any "[i]nformation obtained" from such an inquiry must be "treated as . . . confidential."  *Id.* § 12112(d)(3)(B) & (4)(C).

Plaintiff claims that Smucker violated the ADA.  (ECF No. 1., ¶ 78, PageID #13.)  Specifically, she contends that Smucker made impermissible medical inquiries into her "COVID-19 vaccination status as well as her past medical history."  (*Id.¸* ¶ 81, PageID #13.)  In addition, Ms. Mendoza argues that forcing her to sit in an area designated for workers that had not provided their vaccination status disclosed her medical history.  (*Id.*, ¶ 82.)  Smucker had an obligation, she contends, to treat her vaccination status as confidential.  (*Id.*, ¶ 83.)  These claims sound in two ADA causes

8

of action:   an improper inquiry into Ms. Mendoza's medical history, 42 U.S.C. § 12112(d)(4)(A), and the failure to treat her vaccination status "as a confidential medical record," *id*. § 12112(d)(3)(B) & (4)(B).  The Court addresses each in turn.

### I.A.    Improper Inquiry

In the typical "claim for disability discrimination, the plaintiff must show that . . . she is disabled." *Booth v. Nissan N. Am., Inc.*, 927 F.3d 387, 393 (6th Cir. 2019) (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)).  To assert "an allegedly improper medical inquiry," however, a "plaintiff need not prove that he or she has a disability." *Lee v. City of Columbus*, 636 F.3d 245, 252 (6th Cir. 2011). Rather, the ADA "protects all employees from medical inquiries, regardless of whether they have a qualifying disability." *Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 573 (6th Cir. 2014).  Still, for an inquiry to violate the Act, it must relate back to the statutory focus on "whether [an] employee is an individual with a disability." 42 U.S.C. § 12112(d)(4)(A); *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 95 (2d Cir. 2003).  In other words, the inquiry must reveal real or perceived disabilities within the meaning of the ADA. *Id.* (citing *Roe v. Cheyenne Mountain Conf. Resort*, 920 F. Supp. 1153, 1154–55 (D. Colo. 1996), *aff'd in pertinent part*, 124 F.3d 1221 (10th Cir. 1997)).  Such an inquiry is improper unless it is "job-related and consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A).

Under the ADA's definition of disability, Smucker did not inquire into whether Ms. Mendoza was disabled.  Nor did its inquiry or actions disclose a perceived disability, at least as defined under the Act and on the facts alleged.  To assess her request for a religious exemption, Smucker asked about Ms. Mendoza's religious

convictions; history with other vaccines, medications, and flu shots; and track record of requesting religious exemptions. (ECF No. 1., ¶ 33, PageID #6.) Some of these questions plausibly constitute medical inquiries. But not all medical inquiries relate to a real or perceived disability, as an ADA claim must. *Bates*, 767 F.3d at 578. Ms. Mendoza does not plead that Smucker raised these questions to ascertain whether she is disabled. By Ms. Mendoza's own account, Smucker investigated the sincerity of her religious objection to the vaccine. (ECF No. 1, ¶ 34, PageID #6.) But the sincerity of one's religious beliefs has no bearing on the disability inquiry on the facts alleged. To the extent any of these inquiries implicate perceived disabilities within the meaning of the Act, preventative treatments, such as flu shots or other vaccines, relate to disabilities only indirectly at most. In any event, Smucker's policy provided for accommodations for medical reasons. However personal, intrusive, and offensive, the questions Smucker asked Ms. Mendoza were independent of "whether [she] is an individual with a disability" or perceived as one. 42 U.S.C. § 12112(d)(4)(A).

### I.A.1. COVID-19 Cases

A few cases have addressed related questions. One court dismissed an improper-inquiry claim on a motion to dismiss because the plaintiff had not "plausibly suggest[ed] that a vaccine attestation" and other COVID-related inquiries (such as temperature screenings) were "inquiries or medical examinations that would reveal disabilities." *Sharikov v. Philips Med. Sys. MR, Inc.*, No. 122-cv-00326, 2023 WL 2390360, at *15 (N.D.N.Y. Mar. 7, 2023). In that case, the plaintiff's employer implemented a requirement that its workforce be vaccinated against COVID-19, and

the plaintiff brought ADA claims after he was fired for refusing to comply. *Id.* at *3, 6; *see Chancey v. BASF Corp.*, No. 3:22-CV-34, 2022 WL 18438375, at *4 (S.D. Tex. Dec. 29, 2022) (dismissing claim where an employer subjected unvaccinated workers to additional safety measures).

Other cases have held that being unvaccinated against COVID-19 is not a disability under the ADA. *Speaks v. Health Sys. Mgmt., Inc.*, No. 522-cv-00077, 2022 WL 3448649, at *5 (W.D.N.C. Aug. 17, 2022); *Jorgenson v. Conduent Transp. Sols., Inc.*, No. 22-cv-01648, 2023 WL 1472022, at *4 (D. Md. Feb. 2, 2023); *Leggo v. M.C. Dean, Inc.*, No. 22-cv-374, 2023 WL 1822383, at *4 (E.D. Va. Feb. 7, 2023). Similarly, "testing positive or being exposed to COVID-19" does not make a person "disabled for the purposes of the ADA." *Champion v. Mannington Mills, Inc.*, 538 F. Supp. 3d 1344, 1350 (M.D. Ga. 2021). In short, the law requires an improper-inquiry claim to tie back to the statutory definition of a disability. Plaintiff's claim does not.

### I.A.2. EEOC Guidance

Both parties rely on EEOC guidance, which points in the same direction. *See Lee*, 636 F.3d at 256 (characterizing EEOC guidance as "very persuasive authority" (citation omitted)). "A 'disability-related inquiry,'" the guidance explains, "is a question (or series of questions) that is likely to elicit information about a disability." EEOC, *Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees under the ADA*, General Principles § B.1. (July 26, 2000) (*available at* https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees#N_16 ). Questions whether one is inoculated against the flu or COVID are unlikely to elicit details of a

substantially limiting "physical or mental impairment."  42 U.S.C. § 12102(1)(A).
Specific to COVID, the guidance provides: "When an employer asks employees
whether they obtained a COVID-19 vaccination, the employer is not asking the
employee a question that is likely to disclose the existence of a disability."  EEOC,
*What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and
Other EEO Laws*, § K.9. (Oct. 13, 2021) (available at https://www.eeoc.gov/wysk/what-
you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws ).

Ms. Mendoza counters that the guidance does not excuse inquiries into
vaccinations against other illnesses.  (ECF No. 13, PageID #96–97.)  But those other
inquiries investigated Ms. Mendoza's religious sincerity not her disability status.
Indeed, the EEOC guidance lists examples of questions that may constitute a
disability-related inquiry.  One asks whether an employee "has taken any
[prescription] drugs or medications."  *Enforcement Guidance*, General Principles
§ B.1.  Smucker's questions did not implicate this guidance.  *Id.*  Contracting an
illness like the flu or COVID is not a disability, so inquiring into an employee's
vaccination or flu-shot status does not relate to a disability.  *See McCone v. Exela
Techs., Inc.*, 21-cv-912, 2022 WL 801772, at *4 (M.D. Fla. Jan. 14, 2022).  As the
guidance puts it, "COVID-19 is not always a disability."  *What You Should Know
About COVID-19*, § A.5.  And Smucker's inquiries question whether Ms. Mendoza has
"avoided other medications or medicines" are different than asking what medicines
she has taken.  (ECF No. 1., ¶ 33, PageID #6.)  According to the EEOC's guidance,
the latter question could tend to reveal information about a disability, but the

guidance is silent on the former.  In any event, as noted, Smucker's questions went to the availability of a religious exemption, not information about a real or perceived disability within the meaning of the ADA.

"Only disability-related inquiries and medical examinations are subject to the ADA's restrictions. Thus, the first issue that must be addressed is whether the employer's question is a 'disability-related inquiry.'" *Enforcement Guidance*, General Principles § B.  Smucker made inquiries that did not trigger the protections of the ADA.  Therefore, the Court need not consider whether the inquiries were "job-related and consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A).

### I.B.    Wrongful Disclosure

Plaintiff argues that Smucker "divulged confidential medical facts and information to her coworkers" by requiring her to work in "an area of the office designated for unvaccinated employees."  (ECF No. 1., ¶ 82, PageID #13.)  That disclosure caused Ms. Mendoza unspecified "non-economic losses, ridicule, shame, and emotional distress." (*Id.*, ¶ 85, PageID #13.) As with Plaintiff's improper-inquiry claim, this claim does not require that a plaintiff have a disability within the meaning of the ADA to state a claim.  Also like an improper-inquiry claim, however, the disclosure must reveal real or perceived disabilities within the meaning of the Act.

For this claim, Plaintiff relies on 42 U.S.C. §§ 12112(d)(3)(B) & (d)(4).  The former provision of the ADA requires an employer to maintain medical information "on separate forms and in separate medical files" and to treat it "as a confidential medical record." *Id.*  But that provision applies to entrance health and medical exams

13

before an employee commences employment.  *Id.* § 12112(d)(3).  On the facts alleged, it has no application.

With respect to current employees, the ADA prohibits inquiries into whether an employee is an individual with a disability unless that information is job-related and a business necessity.  *Id.*, § 12112(d)(4)(A).  But it does permit employers to "conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program," and "inquir[e] into the ability of an employee to perform job-related functions."  42 U.S.C. § 12112(d)(4)(B).  "Information obtained" from either inquiry must be "collected and maintained on separate forms and in separate medical files" and "treated as a confidential medical record."  *Id.* § 12112(d)(3)(B) & (4)(C).  Therefore, "to survive a Rule 12(b)(6) motion, the complaint must affirmatively allege that the defendant obtained the disclosed medical information pursuant to a medical examination or inquiry."  *Taylor v. City of Shreveport*, 798 F.3d 276, 288 (5th Cir. 2015).

Without question, Smucker asked Ms. Mendoza her vaccination status, which falls within the ordinary meaning of "medical information."  Therefore, the question under the ADA becomes whether Smucker allegedly violated the Act's limits on the uses to which such information may be put.  42 U.S.C. § 12112(d)(4)(C).  It contains two:  (1) the medical information obtained must be treated as confidential, *id.*, § 12112(d)(3)(B), and (2) medical information may be used only in accordance with the ADA, *id.* § 12112(d)(3)(C).  As relevant here, only managers or supervisors in the workplace may "be informed regarding necessary restrictions on the work or duties

of the employee and necessary accommodations." *Id.*, § 12112(d)(3)(B)(i). By publicly segregating Ms. Mendoza and other employees based on medical information (namely, vaccination status), Smucker went beyond the disclosures of medical information the Act permits. *Id.*

Even so, Plaintiff fails to state a claim under the ADA because these provisions of the statute depend on the same definition of a disability that forecloses, as a matter of law, Plaintiff's improper-inquiry claim. That is, Section 12112(d)(1) extends "[t]he prohibition against discrimination" to "include medical examinations and inquiries." And discrimination under the ADA means discrimination on the basis of disability. As already explained, however, Plaintiff does not allege a disability within the meaning of the ADA. Indeed, "Plaintiff acknowledges that questioning an employee about a COVID-19 vaccine is not considered a disability related inquiry." (ECF No. 13, PageID #96.) Instead, her dispute involves a religious exemption.

One final note about Plaintiff's claims under the ADA. She argues that Smucker violated its COVID-19 vaccination policy, which requires an employee's vaccination status to remain confidential. (ECF No. 13, PageID #100.) However, that policy commitment is limited "in accordance with applicable law." (*Id.*) While employees might have understood, with some justification, that Smucker was making a broader promise, the legal privacy protections for the information disclosed about Ms. Mendoza do not extend as broadly as she perhaps thought. In any event, Plaintiff does not bring a claim for breach of contract.

15

## II.     Ohio Law

Plaintiff claims that her termination violates the laws of both Ohio and Louisiana against employment discrimination and retaliation.   Ohio Rev. Code § 4112.02(A); La. Stat. Ann. § 23:332(A)(1).  Arguably, the conduct alleged in this case relates to events in each State.  Ms. Mendoza lived and worked in Louisiana during her employment with Smucker.  (ECF No. 1, ¶ 1, PageID #1.)  For its part, Smucker has its principal place of business in Ohio, where it is fair to infer that the company developed and implemented its COVID-19 vaccination policy at issue.  (*Id.*, ¶¶ 3 & 21, PageID #2 & #4.)  As to Ms. Mendoza in particular, the complaint alleges that "staff from employee relations, legal[,] and senior leadership" collectively decided against her request for a religious exemption.  (*Id.*, ¶ 32, PageID #6.)  And Plaintiff avers that the relevant "conduct, injuries[,] and damages" occurred in both States. (*Id.*, ¶ 4, PageID #2.)

Based on the allegations in her complaint, Plaintiff argues that her termination and claimed injuries originate in Ohio.  In seeking dismissal, Defendant contends that Ohio law does not apply extraterritorially to employees working outside the State and, additionally, that Louisiana law applies under choice-of-law analysis because Ms. Mendoza allegedly suffered the harm of which she complains there. (ECF No. 10-1, PageID #59–60.)

### II.A.   Extraterritorial Application

Defendant argues that Ohio's employment discrimination laws apply only to employees living or working in the State.  (ECF No. 10-1, PageID #59–60.)  Smucker rests this argument on the presumption that a law is "meant to apply only within the

territorial boundaries of the" government that enacted it.  *Union Underwear Co., Inc. v. Barnhart*, 50 S.W.3d 188, 190 (Ky. 2001); *Judkins v. Saint Joseph's Coll. of Me.*, 483 F. Supp. 2d 60, 65 (D. Me. 2007); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 268 (2012) (noting constitutional underpinnings of the presumption against extraterritorial application of State law).

Defendant cites no authority to establish that Section 4412.02 does not apply to Plaintiff's case.  Textually, that statute prohibits "any employer" from discriminating against a current or prospective employee on several bases, including religion.  Ohio Rev. Code § 4112.02(A).  An "employer" means a company "employing four or more persons within the state."  *Id.* § 4112.01(A)(2).  Smucker meets this definition.  At the pleading stage, the allegations make a showing that Smucker took discriminatory employment action against Ms. Mendoza from Ohio.  In that sense, Ms. Mendoza's termination arguably falls within the prohibition against religious discrimination that Ohio law imposes on Ohio employers.

Doctrinally, the Ohio Supreme Court's holdings on extraterritoriality cut against Smucker.  The Ohio Supreme Court extends "the protections of R.C. Chapter 4112" beyond State lines, allowing the Ohio Civil Rights Commission to continue its administrative review of a discrimination "claim of a nonresident employee who works outside Ohio for an Ohio employer."  *State ex rel. Natalina Food Co. v. Ohio Civil Rights Comm'n*, 55 Ohio St. 3d 98, 100, 562 N.E.2d 1383 (Ohio 1990) (per curiam).  There, the Ohio Supreme Court rejected an argument based on "'extraterritorial' effect" because the law sweeps "broad enough to extend the

protections" to workers outside Ohio. *Id.* Following the Ohio Supreme Court's precedent, lower courts in Ohio recognize "the intent of R.C. Chapter 4112 to prevent discriminatory practices by employers who seek the benefit of the Ohio economy by having a minimum number of employees . . . in Ohio." *Wilkerson v. Howell Contrs., Inc.*, 163 Ohio App. 3d 38, 2005-Ohio-4418, 836 N.E.2d 29, ¶ 18 (reversing dismissal of Ohio discrimination claim by Kentucky plaintiff).

In the context of worker's compensation, the Ohio Supreme Court upholds "the right of an employee of an Ohio employer to compensation from the state fund for an extraterritorial injury." *State ex rel. Bailey v. Krise*, 18 Ohio St. 2d 191, 192–93, 249 N.E.2d 55 (1969). The Ohio Supreme Court explained that the Ohio workers' compensation law, Section 4121.13, protects "employees of *every* employment and *place of employment*," *id.* at 197, much as Section 4112.02 applies to "any employer." That broad language, the Ohio Supreme Court held, "extend[s] extraterritorial protection to employment relationships in which Ohio has a legitimate interest." *Id.* (emphasis removed). Later, the Ohio Supreme Court relied on *Bailey* to hold that "Ohio's specific safety requirements" and worker's compensation laws "appl[ied] extraterritorially" to the employee of an Ohio company injured while working in Indiana. *State ex rel. Winzeler Excavating Co. v. Industrial Comm'n of Ohio*, 63 Ohio St. 3d 290, 293, 586 N.E.2d 1087 (1992); *see also Prendergast v. Industrial Comm'n of Ohio*, 136 Ohio St. 535, 543, 27 N.E.2d 235 (1940).

Ohio's jurisprudence on extraterritorial application of employment laws provides a weak foundation for Smucker's argument against extraterritorial

application of Ohio's antidiscrimination statute to an Ohio employer.  Nor does the Commerce Clause embody a rule against extraterritorial enforcement of State laws. *See National Pork Producers Council v. Ross*, 598 U.S. ___, 2023 WL 3356528, at *8 (2023).  Therefore, the Court proceeds to choice-of-law analysis to determine which State's laws apply to Plaintiff's claims.

### II.B.  Choice of Law

"The question of which state's substantive law applies in a case is a question of law." *American Family Life Assurance Co. v. United States Fire Co.*, 885 F.2d 826, 830 (11th Cir. 1989).  Ohio's choice-of-law rules govern that question.  *Muncie Power Prods. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  In Ohio, "an actual conflict between Ohio law and the law of another jurisdiction must exist for a choice-of-law analysis to be undertaken."  *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St. 3d 470, 2006-Ohio-6553, 861 N.E.2d 109, ¶ 25; *see also Moore v. Weinstein Co., LLC*, 545 F. App'x 405, 411 (6th Cir. 2013).  "If the laws of the states do not conflict, then no choice-of-law analysis is necessary."  *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002).  In the case of an actual conflict, Ohio subscribes to the choice-of-law approach of the Restatement (Second) of Conflict of Laws.  *Morgan v. Biro Mfg. Co.*, 15 Ohio St. 3d 339, 341–342, 474 N.E.2d 286 (1984) (per curiam). Under that approach, "the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit."  *Id.* at 342 (citing Restatement (Second) of Conflict of Laws § 146).

19

### II.B.1. Actual Conflict

Plaintiff argues that the Ohio Civil Rights Act and the Louisiana Employment Discrimination Law do not conflict.  Both laws are modeled after Title VII and prohibit the same discriminatory conduct.  (ECF No. 21, PageID #160.)  In no circumstance does one law gives rise to liability where the other would not.  Defendant does not dispute those points but argues that the laws conflict with respect to remedies.  (ECF No. 22, PageID #166.)  The Ohio Civil Rights Act "authorizes an award of punitive damages in civil employment discrimination actions."  *Rice v. CertainTeed Corp.*, 84 Ohio St. 3d 417, 418, 1999-Ohio-361, 704 N.E.2d 1217.  Louisiana's law does not.  *See Mitchell v. Parish of Jefferson*, No. 19-cv-13298, 2020 WL 1046352, at *5 (E.D. La. Mar. 4, 2020).

Defendant cites persuasive authority for the proposition that a divergence between two States' remedial laws establishes an actual conflict.  (ECF No. 22, PageID #167.)  For example, the Southern District of New York held that the Ohio Civil Rights Act conflicts with New York law because "punitive damages are not available for employment discrimination actions under" the latter.  *Hernandez v. Office of the Comm'r of Baseball*, No. 18-cv-9035, 2019 WL 3034841, at *3 (S.D.N.Y. July 11, 2019) (quoting *Robins v. Max Mara, U.S.A., Inc.*, 923 F. Supp. 460, 464 (S.D.N.Y. 1996)).  Similarly, a district court found Missouri law in conflict with Jordanian law on the issue of punitive damages, even though none existed on the underlying question of liability in tort.  *Hersh v. CKE Restaurants, Holdings, Inc.*, 571 F. Supp. 3d 1046, 1053 (E.D. Mo. 2021), *aff'd sub nom. Estate of I.E.H. v. CKE Restaurants, Holdings, Inc.*, No. 22-1488, 2023 WL 2620251 (8th Cir. Mar. 24, 2023)

20

(per curiam).  Because the employment discrimination laws of Ohio and Louisiana conflict with respect to the availability of punitive damages, the Court must choose the law that applies to this case.

### II.B.2. Applicable State Law

Ohio applies the choice-of-law approach of the Restatement (Second) of Conflict of Laws, the "more significant relationship" test.  *Morgan*, 15 Ohio St. 3d at 341–342.  The factors relevant to that test are:  (1) "the place of the injury"; (2) "the place where the conduct causing the injury occurred"; (3) the domicile, residence, place of incorporation, and place of business of the parties; (4) the place of the relationship between the parties; and (5) any other relevant factors.  *Id.* (citing Restatement (Second) of Conflict of Laws § 145); *see Muncie Power*, 328 F.3d at 874 (applying *Morgan*).

Ms. Mendoza sustained her injury in Louisiana.  As one Ohio court stated, "in a wrongful termination" case, "the place where the plaintiff lives and works is the place of injury."  *Walker v. Nationwide Mut. Ins. Co.*, 10th Dist. Franklin No. 16AP-894, 2018-Ohio-1810, ¶ 20 (Ohio Ct. App.) (citing *Hoyt v. Nationwide Mut. Ins. Co.*, 10th Dist. Franklin No. 04AP-941, 2005-Ohio-6367, ¶ 27 (Ohio Ct. App.)).  Under the second factor, the conduct causing the alleged injury was the decision to fire Ms. Mendoza.  Construing the complaint in favor of Plaintiff, that conduct occurred in Ohio, as did the decision to deny the requested an exemption.  (ECF No. 1, ¶¶ 21 & 32, PageID #4 & #6.)  With respect to the third factor, the location of the parties, Ms. Mendoza resides and works in Louisiana, and Smucker in Ohio.  (*Id.*, ¶¶ 1 & 3, PageID #1 & #2.)  So, the third factor begs the choice-of-law question.  As for the

fourth factor, the setting of the relationship between the parties, Ms. Mendoza has no apparent connection to Ohio other than working for Smucker, an Ohio company, which also conducts business and employs Ms. Mendoza in Louisiana.

The Restatement instructs courts to evaluate the factors "according to their relative importance with respect to the particular issue."  Restatement (Second) of Conflict of Laws § 145.  Further, it instructs courts not to enforce "a foreign cause of action . . . contrary to the strong public policy of the forum."  *Id.* § 90; *see American Interstate Ins. Co. v. G & H Serv. Ctr., Inc.*, 112 Ohio St. 3d 521, 2007-Ohio-608, 861 N.E.2d 524, ¶ 17 (allowing Ohio court to apply Louisiana law despite conflict).  The particular issue in conflict here is the availability of punitive damages. The availability of punitive damages under Title VII mitigates Ohio's interest in authorizing a penalty that Louisiana law does not.  *See* 42 U.S.C. § 1981a(b)(1); *cf. Greer–Burger v. Temesi*, 116 Ohio St. 3d 324, 2007-Ohio-6442, 879 N.E.2d 174, ¶ 12 (treating Ohio law as coextensive with Title VII).

Considering all these factors, the most significant relationship between the parties here is Louisiana as the place where Ms. Mendoza worked for Smucker and where she sustained her alleged injuries.  Therefore, the Court determines that Louisiana law governs Plaintiff's State-law claims.  That choice of law, however, does not foreclose Plaintiff's prayer for punitive damages under federal law.  (ECF No. 1, ¶¶ 67 & 77, PageID #11, #12, & #13.)  And the potential availability of punitive damages under federal law vindicates any interest Ohio might have in enforcement of its antidiscrimination laws on this set of alleged facts.

## CONCLUSION

For these reasons, the Court **GRANTS** Defendant's motion to dismiss Counts One and Two to the extent they assert claims under Ohio law and Count Three.

**SO ORDERED.**

Dated:  May 22, 2023

_____
J. Philip Calabrese
United States District Judge
Northern District of Ohio

23